May it please the court, my name is Rachel Baird. I represent American News and Information Services, Inc., James C. Playford, and Edward Peruta as the appellant plaintiffs in this case. At the core of each claim raised in this case is the animus that the County of San Diego has towards news gatherers and the media who do not possess a government issued media credential card. The public information officer for the County of San Diego, Jan Caldwell, testified at a deposition below, which is in the record, that if a media credential is not issued by the government, then it is not valid. She indicated that without a government issued media credential, then individuals are not allowed within sheriff's headquarters, but they may attend news conferences outside headquarters, and that's in the record at pages 102 and 103. What's wrong with that? My next sentence was going to address what's wrong with that. The messenger, the government agency with the information, chooses under this scenario who carries the message, and that's what's wrong with it. The message is that the government should not be in the business of issuing media credentials, and if they do, those media credentials should have no greater authority than media credentials issued by private organizations. Are these issued pursuant to neutral criteria? They're issued by the, in the County of San Diego, they're issued by San Diego Police Department. I know, but is the criteria, does the same criteria apply to everybody? I mean, theoretically, they want to have some sense that they've looked into who they're letting in to the police station or the crime scene. What's wrong with that? Well, number one, there's no evidence that they are issued on an objective basis. But you're not making an equal protection claim here. You're making a First Amendment claim. We are. What case says there's a First Amendment right to attend news conferences? Well, there's a First Amendment right to record police activity of public concern.  Is there a case that says that there's, I'm unaware of one, but perhaps you know of one. Is there a case that says that someone has a First Amendment right to attend a news conference? A small part of this case focuses on a news conference. Most of this case. I want to ask you about other parts of the case, but this is what you were talking about. Yes. You were talking about absent a credential, they can't go to certain places, and one of them was a news conference. So is there a First Amendment case that says there's a right to attend news conferences? I would rely on the fact that news conferences are public activities that. But the reason I'm asking is you have a 1983 action here. One of the things in 1983 is we have to have clearly established law. So one would think if you're going to contend that that violates the First Amendment, you'd be able to give me a case that says so. Is there one? No, I do not know of one. But I would argue that the right to attend a news conference is subsumed within the right to record activities of public concern. That is clearly established law in this circuit, and that's one of the first issues I'll address, because the district court did not agree. And so I do want to get to that next. But I would argue it's assumed within that. I could ask you to turn next to I think what's a difficult part of this case, and I want to hear what you have to say about it. You have three claims that are retaliatory arrest claims. Yes. The Supreme Court now has the Lozman case in front of it, in which it's going to decide whether or not there is a First Amendment right to be free for retaliatory arrest. Shouldn't we wait for that case before we address those claims? Well, I mean, the timing issue is important in this analysis. The court below relied on Acosta v. City of Colsa Mesa. And that incident happened on January 1, 2006. And you look at the time when the incident happened and what the status was of the law at that time. But what if the Supreme Court says there is no right, not clearly established, there's no right whatsoever to be free from retaliatory arrest if there is probable cause? Doesn't that mean you lose? Well, the Ninth Circuit could certainly have a higher level. Really? No. I was thinking of state law on that one. I'm sorry, Your Honor. It's not state law. It's federal law.  That's the issue in front of the court. So if the court says there is a First Amendment right, maybe your case is better. If the court says there's no First Amendment right, it really doesn't matter what we thought the clearly established law was in 2006 or in 2014 or in 2013. You lose those claims, don't you? Well, but I have to make the argument today. Well, no, but you can make the argument today. I'm saying we will know at some point later this year whether or not your First Amendment retaliation claims survive. If they do, then we have to figure out whether or not the law was clearly established. If they don't, we're done with them, are we not? Has Lesmond been set for a hearing yet? Do you know? I do not know, Your Honor. It was granted back in November. Yeah, I can check the Supreme Court docket, but I suspect we'll have an answer before June because that's when they go home. They're awfully slow this year. They're slow with the signing cases. But without regard to when it occurs, do you agree that if the Supreme Court says there is no First Amendment right to be free of retaliatory arrest if there is probable cause, that those three claims that you make in this case fail? It does not fail with regard to the March 25, 2012 arrest. That's not a retaliatory arrest claim. That's a Fourth Amendment claim. I brought it under both, but okay. Okay, but at least with respect to the three for which there is probable cause, they will be governed if the Supreme Court reaches the merits of that case by that case, will they not? Definitely with the December 1, 2011 arrest. You have three for which you've conceded in the briefs there are probable cause. I argued, or I meant to argue, I hope I did, that with regard to the February 28, 2010, and March 9, 2010 arrest that were consolidated for state court trial and ended in a mistrial and that Playford ended up pleading no contest, and that's in the record, to making excessive noise or something along those lines. I've included that statute in the appendix. Doesn't Heck bar you from challenging the probable cause for a crime for which your client was convicted in state court? Well, I included in my appendix the statute for the different methods of finding guilt under state law. No, but that's a separate question. Doesn't the conviction, your no low plea under state law led to a conviction, right? Your client's no low plea or no contest plea? It was a no contest, and it says that it can't be used in a civil action against him. That's right, but it led to a conviction for a lesser offense, correct? It did. And doesn't Heck tell us that we can't question the probable cause underlying a state conviction? Heck says that, but perhaps in deciding this issue, when the Supreme Court decides it, that could change other things with regard to Heck and what the hierarchy is on what counts as a conviction, what counts under state law. So I would not want to concede that at this point without, if the landscape changes, I want to know how it changes to make other arguments. Did you even discuss that in your opening brief? Discuss what? Heck. I did. Heck's in there. The district court's finding that Heck barred the, I guess, December 1, 2011 claim. I discussed that there is more than enough evidence of retaliatory animus to overcome Heck, especially, well, especially in the fourth arrest, the May 25, 2012 arrest. If I could, I'll look at my table of authorities and see where I cite. You can do that later. Okay. So in going forward, assuming that the, or not assuming, I'd never want to assume, but under the option that the Supreme Court finds that even if probable cause exists, you can still make a claim for First Amendment retaliatory animus. I would argue that in 2010, 2011, and 2012, when Playford was arrested, that Skoog v. County of Clackamas applied. What do you do with Acosta? I say that that. I'm not sure what we do with Acosta since it doesn't discuss Skoog or Jones, but doesn't Acosta say not only was it not clearly established, but it presages Loessman. It says there was no such right. Well, but Acosta. Loessman's being argued on February 27th. Okay. Acosta applies to an incident that happened on January 1, 2006. Skoog wasn't a decision until November of that same year, 2006. So, of course, when the gentleman was arrested, I think it was in City Hall, or the police arrested him in City Hall at a hearing or a forum, the police couldn't have known what the Skoog court was going to decide 10 months later. Isn't that exactly what happened in Reichle or however you pronounce it? Case comes up to the Supreme Court, and the Tenth Circuit has clearly established law at the time of the arrest that there's a First Amendment right to be free from retaliatory arrest even with probable cause. Yes. The Supreme Court gets the case and says, we don't care what your clearly established law was at the time. Go back and take another look at it because we're not sure you're right. And then the Tenth Circuit on remand says, you're right, it wasn't clearly established. So what you're saying is that the Supreme Court remanded Reichle was without any purpose because what it should have simply said is, well, what was the Tenth Circuit law at the time? But it's difficult to compare what was the law in the Tenth Circuit. Well, it was exactly the same. The Tenth Circuit law prior to Reichle in two cases says, as we did in Skoog, there's this First Amendment right. Case comes up to the Supreme Court, and by the way, they'd reconsidered it in light of Hartman at one point and still said, Hartman doesn't make any difference. That's the McLaughlin case. Comes up to the Supreme Court, and the Supreme Court says, take it back and look at it again. We're not so sure you're right. Now, put aside what the Tenth Circuit does later. If only what the law was in the circuit at the time mattered, what was the Supreme Court doing? Why was it sending it back? It seems to me that it has to – it can't be that if the law changes after what it was at the time of the arrest, that the arrest was illegal, because the Supreme Court sent it back in Reichle and said, take another look at it. I just don't know how you can take a case that came out of the Tenth Circuit with the law that's there, and the Supreme Court said, take another look at this. We don't know what the Supreme Court intended. We don't know why the Tenth Circuit did what it did. Well, but we do know that the law was clearly established in the Tenth Circuit at the time, and the Supreme Court didn't say, that's enough. And that's what you're saying to us. It's enough that it was clearly established at the time. If that were enough, the Supreme Court never would have remanded in that case, would it? It may have. It depends on the case and what exactly the Supreme Court was looking for. Maybe it was looking for the Tenth Circuit to say, yes, it was enough. We've reviewed it, and to us it's enough. If the Supreme Court wanted to overturn it or not have that to be a principle of law in the Tenth Circuit or any other circuit, then they would have made the decision then. I thought that it was always Fourth Amendment law, clearly established by several Supreme Court cases, that the state of mind of the arresting officer was totally irrelevant as long as there was probable cause. The fact that you'll find, if you put my name in with that proposition in the Second Circuit, you'll find that I was reversed. That's the Wren case. That's the Wren case. I was reversed because I thought that it was so obviously pretextual. An automobile stop, and they said, the Second Circuit said, you're totally wrong. The Supreme Court said that it doesn't matter in Scott, in Wren, in any number of cases, what the subjective state of mind of the police officer is. But when it comes to, oh. With his probable cause. Aside from your First Amendment retaliatory claims, what's the strongest of your remaining claims that you want to say something about in your 16 seconds you have left? Well, I came prepared to argue about the First Amendment retaliation claim. I came prepared to argue about the false arrest claim in Count 7 of the Second Amendment complaint. That was the incident that happened on May 25, 2012. There were issues of material fact in that case. There was a news reporter from the Ramona Sentinel that was allowed to record the scene close to the scene, closer than where Mr. Playford was. And there were comments made at the time that you don't have media credentials issued by the government. You're not the media, so you can't come forward. And that's a problem we have in this case. I wanted to ask a question about that, if I could, Judge Bordlaw. As I understand it, the facts of that one is that your client was, where they say people without media credentials are not supposed to be. And your argument is, well, so was somebody else. Yes. Okay. Yes, most definitely. And then the third argument I was going to make was there are issues of material fact on the retaliation claims made against the public information officer, Jan Caldwell, especially towards the end of my section. It starts, I think, at page 68 of my brief. But it talks about how at first she was saying she disseminated a picture of Mr. Playford to the lobby officers at headquarters. And then she changed that and said, well, it must have been after May 25, 2012, so it doesn't apply to the retaliation. And then we came forward with the same picture that was in the newspaper in 2011. And then she submitted, in response to our summary judgment, an e-mail that clearly shows that Mr. Playford's picture, also pictures of two other newsgatherers, were disseminated to people out in the field. And along with her comments that she made to the Society of Professional Journalists. And we do say that she is a policymaker and that she is responsible for any failure to train by the county. And we have quotes from her deposition saying she is a policymaker. And so we believe that that is one of our stronger arguments, too, that the First Amendment retaliation claim and failure to train against Jan Caldwell should have survived the motion to dismiss and the motion for summary judgment. And finally the – Did she say anything that was not true? I mean, didn't she – I mean, he didn't at that time have credentials, correct? Mr. Playford, he did not have government-issued credentials. Why – what's the basis for their animus? Why did they pick a name out of a hat? Or did they have some – did he take some picture that he shouldn't have that embarrassed them? Yes. Yes, and I allege that in my complaint, I allege that his relationship with the Sheriff's Department was very good up until 2009 when he recorded a gentleman named Eric Baker, who allegedly was the victim of excessive force. And Eric Baker was arrested. He ended up filing a federal district court action. And also Mr. Playford videotaped a prostitution ring in McGonigal Canyon back around that time that the county and the city maintained had been cleaned up and didn't exist anymore. And it was after this period of time that he received indication that his media credentials issued by the city of San Diego – he did have them at one time, but they were revoked at the beginning of February 2010. And it said, because of your actions. And it didn't specify what actions they were being revoked for. He wasn't convicted of anything at that time. Does the city have written criteria for who gets a media credential and who doesn't? Not that we have been able to find. It's not posted on their website. We know of no policy about that. We don't know – we don't know – I don't know of any, Your Honor. And then the final issue I was going to address was the Federal Privacy Protection Act. Mr. Playford's camera and the contents were seized on the last three of the arrests. And the court relied on the section – the exception to the Federal Privacy Protection Act, which allows for the seizure when the materials are related to the reason for arrest. And there's a case like that recording in a courthouse. That's related to the arrest. You're not supposed to record in a courthouse. But we argue that there's a caveat to the exception in the Privacy Protection Act, which says if you're taking that material because you are receiving it for distribution, in other words, if you're a news gatherer, then it's not supposed to be seized under the PPA. And we argue that this is an important PPA case and ask the court to consider that. All right. Thank you. Thank you. Thank you. Good morning. May it please the Court. James Chapin for the appellees. I think it makes sense to wait the outcome of the retaliation case for the Supreme Court. We didn't have the benefit of that at the time we briefed the case. Assuming we had to address it now, what is and what was clearly established in the Ninth Circuit with respect to? Certainly at the time of the incident, it was clearly established law in the Ninth Circuit that a First Amendment protected someone against an arrest in retaliation for expressed views with probable cause, right? Yes. And then to a certain extent, but then Reichel came along and said, well, it's not clearly established, and the Acosta panel thought because of that it wasn't. All that Reichel said was go back to the Tenth Circuit and look at it again in light of Hartman. A strange remand because the Tenth Circuit had already looked at it before that in light of Hartman, and we had, too, in Skoog in York. Yes. That's what I don't understand is why Skoog wouldn't be the controlling, well-established law at that particular time. Even if that argument had merit, and it may, there's another aspect of qualified immunity, which is there has to be a case with a particularized set of facts that applies in this context in order. Well, but don't get that particular for a second. What do we do with Acosta then? Acosta doesn't discuss Skoog or York, but it says the right's not clearly established, and indeed it says the right doesn't even exist. It's very interesting that depending on how the Supreme Court rolls in Lozman, we might have an inter-circuit split. Yeah, and we'll have to deal with that later. I'm just trying, the question I really wanted to ask is this. Let's assume that a case in the circuit says a right is clearly established, and then a subsequent case says it's not, and your facts occur before the second case comes out. What are we supposed to do? Well, it sounds like it's still debatable, and we're still debating it today. So I don't know how public officials can make decisions based on that. So is the issue whether it's debatable at the time of the events or whether it's debatable when the case gets to us? That's an interesting question, and if there's a continuum of debate going on, then I don't know how to answer that, but I think you still have to go to the other aspect that there has to be a case with a particularized set of facts under all these recent Supreme Court and Ninth Circuit opinions to talk about that. Can I just go back? I'm just wondering. So it's the city who decides who's entitled to the credentials? Correct, and all the law enforcement agencies in San Diego County rely on that evaluation. So the sheriff's department and everybody else would rely on the city? Correct, and that was never litigated in this case. Okay, but does the city have a set of criteria? Because this whole thing seems to stem from the fact that at one point he had the city credentials, and then at some point they were revoked. I mean, they might have been revoked arbitrarily. I don't know what action might have existed at that point. They have criteria, but because that claim was dismissed so early in the case, that evidence was never brought before the district court, so we don't have that. But yes, we rely on that, and the reason is that you don't want to have a paparazzi event every time you have a crime scene. And so you have to have controls over the paparazzi event, is what I call it, where you have a whole bunch of people crashing a crime scene. This accident scene was literally the paramedics were extracting dead bodies and dying people from this car when Mr. Playford was trying to get as close as he could to film that. So do you do checks, background checks, or do you exclude bloggers? I mean, what does the city do to make sure that that doesn't happen? I'm sure they have background checks, but the goal is to make sure that you can have people who are going to behave and not breach the caution tapes to get into these crime scenes. So in this case, is the revocation of the media credential at issue? I don't know that it's an issue. I didn't see that it was. It never came up as a part of the litigation. Wait a second. Doesn't it form the basis for the alleged animus? I mean, I thought that all of this retaliation goes back to the fact that the city was mad at him. They revoked his credentials because the city was mad both about the excessive force case and the prostitution ring videos or photos that he took. So it goes back to the basic animus. That was the city, not the county. Well, the city revoked it, but based on those two incidents. Yeah, and that's the city, not the county. Again, the city's not a defendant. Right. The county's relying on – they were a defendant at one time. Right. They've been dismissed. Not here today. So I want to go back to my question then. So the city's revocation of the media credential is not at issue in this case, correct? So my broader question is, is it constitutional to require media credentials to enter crime scenes? I think so because – It has to be your position, doesn't it? It does. And there has to be some case that would make it clearly established that that's a constitutional violation in order for that not to apply. And we didn't litigate it at the district court. But see, the reason I think that just because the city's not in the case at this point, that the county isn't off the hook is that it's very clear from what we have in front of us that the county bases its decisions about who has media credentials on what the city did, right? Isn't that what you started out by saying? That's correct. So even if the city's not here, your whole rationale, the county's rationale, and what the county does is based on whether or not the city has, I don't know, revoked properly or properly given media credentials. Maybe there's not a right. So far no one's cited me a case that there is a right to credentials. And the deputies in the field are relying on that in order to make decisions. So their liability would have to be premised on some sort of unconstitutional policy. What they do is they say we're allowed to keep people out of the scene who don't have media credentials. That's correct. And who has media credentials is decided by the city. That's correct. And they're suing here the deputies who kept them out of the scene. Right, who are just following directions based upon city criteria that they accept and all the law enforcement agencies accept in order to control the media at these crime scenes. And am I correct that the city, the claim against the city was dismissed? Very early. On 12b-6? Yes. That's what I thought. And we went through a series of other 12b-6s. And that's not a subject of appeal. And it was never litigated. We didn't have any factual basis. No, but they could argue that the judge erred in dismissing it, but they do not in their briefs. Right. I don't know if there's anything else you want me to comment on. The various other claims, I think, are addressed thoroughly in the brief. Was the county a party still, or is it just all the individual actors? It's... The county's a Minnell defendant and a failure to train defendant, is it not? Yes, that's the only thing the county's in on. So it's a derivative liability claim against the county and a failure to train whom?  Caldwell, right? Failure to train the PIO. Yes. And Caldwell's not a policymaker for the Sheriff's Department. She's a public information officer. Is there a failure to train claim vis-à-vis the police officers? With respect to the city police officers? Yeah, the individual defendants. Are there individual defendant police officers here? Yes, there are. Well, there are deputy sheriffs. Right, deputy sheriffs. Yeah, and they're the county employees. Is there a failure to train claim vis-à-vis those county employees? There's a failure to train claim against the county for failing to train those deputies. Right. And the training that the record shows is they're told to see whether somebody has a city-authorized media credential. Basically, yes. Okay. With respect to Jan Caldwell, like I said, she's a public information officer. She doesn't set policy. She did disseminate a photograph of Mr. Playford after his behavioral issues and his arrests in 2012. There's no evidence whatsoever that deputies ever saw this photograph. It went to the Ridgehaven headquarters because they had some concern about him showing up at Ridgehaven, which has some public areas where you can go into that aren't secured, and they just wanted to have that available since he had been arrested three or four times. None of the deputies knew Mr. Playford except the first deputy in 2010 because that was his beat. The other arrests were by deputies who had no idea who he was at the time. So unless you have any other questions, I'll submit. Thank you. I'll give you a minute or so too. I just wanted to point out at the record, page 148, it's Jan Caldwell's deposition that was taken on March 16, 2016. She was asked if she has any knowledge about the San Diego Police Department's consideration of credentials. She said no. Do you know if they issue media credentials to felons? She says, my understanding is they do not, but I don't know for sure. Would you have any concerns? I would. Have you been concerned enough to check and see if they do? No, I have not. So if anything, it shows a deliberate indifference to what the standard is for issuing media credentials and a deliberate indifference to whether that's a subjective or objective criteria at work. Thank you. Thank you very much, counsel. American News and Information Services v. Gore will be submitted.
judges: Wardlaw, Hurwitz, Korman